IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

INNOVATIVE ENGINEERING )
SOLUTIONS, INC., )
)  Civ. No. 05-1592-PK
       Plaintiff, )
)
   v. )
)
MISONIX, INC.; and EVANS )  **OPINION AND ORDER**
COMPONENTS, INC., )
)
       Defendants. )
_____)

**PAPAK, Magistrate Judge:**

    Plaintiff Innovative Engineering Solutions, Inc. (IES)
brings this action for patent infringement against defendants
Misonix, Inc., and Evans Components, Inc. (Evans).

    The parties have filed cross-motions for summary judgment.
IES moves to strike a declaration submitted by defendants.  I
grant defendants' motion for summary judgment in part and deny
plaintiff's motion for summary judgment.  I deny plaintiff's
motion to strike as moot.

1  - OPINION AND ORDER

**BACKGROUND**

Silicon chip manufacturers use silane, a gas that spontaneously ignites when exposed to air.  To contain and neutralize the potentially hazardous combustion of silane, manufacturers use "burn boxes" in which silane is allowed to oxidize in a controlled environment.

Plaintiff's president, Samir Shiban, developed an improved burn box while working as a safety engineer for Intel Corp.  One version of Shiban's improved burn box, called a "dynamic neutralization chamber" (DNC), or gaseous effluent mixing chamber, used a fan to mix silane[1] with oxygen for more complete combustion.

In 1993, Shiban formed IES to manufacture and market the DNC technology.  He assigned his rights in the technology to IES.

In October 1993, Intel authorized Shiban to develop and market the DNC technology independently of Intel.  Intel later assigned any rights it had in the DNC technology to IES.

IES reached a license agreement with Delatech, Inc. to produce and market burn boxes using IES's technology.  IES received royalties from Delatech on sales.  The resulting burn boxes, called E.DOCs, were purchased primarily by Intel and one other customer.

IES decided to replace Delatech with a different manufacturer.  In 1995, IES began negotiations with Evans, which

---

[1]  The technology could also be used for other gases that are "pyrophoric," i.e., that spontaneously combust in air.

2  - OPINION AND ORDER

manufactured stainless steel gas-handling equipment.  In February
1997, IES and Evans executed a licensing and service agreement
(the Agreement).  IES agreed to provide Evans with trade secrets,
confidential information, licenses for the DNC technology, and
business contacts.  In exchange, Evans agreed to pay IES
royalties on products manufactured, sold, or serviced using the
DNC technology.  Evans also agreed not to disclose confidential
information and to return such information to IES when the
Agreement terminated.

Evans found that the fans in the E.DOCs clogged and jammed
because of the heat and sand (silicon oxide) produced by the
combustion of silane.  In 1996, Evans developed a forced-air
register to replace the fan.  As required by the Agreement,
rights to the invention were assigned to IES.

The Agreement's original term was three years, starting in
March 1996.  In February 1999, Evans and IES agreed to a one-year
extension of the Agreement.  Evans and IES later exchanged
letters showing their interest in further extending the
Agreement, but the parties never agreed on a definite term.  From
March 2000 until April 2002, Evans and IES continued to operate
under an implied license.

In 2002, Evans began making and selling a gas abatement
product called the Altair, which Evans produced with defendant
Misonix.  Evans refused to pay royalties to IES on sales of the
Altair, contending that it had "designed around" IES's licensed
technology.  IES disputed this assertion.  In February 2004, IES

filed a demand for arbitration with the American Arbitration Association, as required by the Agreement.  IES asserted claims for breach of contract and quantum meruit.

In July 2004, IES submitted additional claims for patent infringement, negligent misrepresentation, misappropriation of trade secrets, and intentional interference with business relationship.  Just before the arbitration hearing, however, IES withdrew its claims for patent infringement.

Shiban, the president of IES, states that IES withdrew the patent infringement claims when "it became evident that that [sic] arbitration was not a suitable setting for those claims. They seemed too specialized and complex to add to what already was a fairly complicated dispute."  Shiban Decl. at 2, ¶ 4.

The arbitrator issued his Interim Award in October 2004. The arbitrator found that the Agreement between IES and Evans "is neither void at its inception, nor is it voidable."  Interim Award at 3, ¶ 8.  The arbitrator also found,

> Pursuant to Section 3 of the Agreement, the duration of the license was three years from March 3, 1996.  The Agreement was extended for a period of one year to March 3, 2000.  There was no written extension thereafter; however, Claimant [IES] and Respondent [Evans] continued to perform as if an agreement existed until April 2002, and, therefore, had an implied agreement.

Id. at ¶ 9.  The arbitrator further found,

> After April 2002, [Evans] ceased sales of E.DOC's and began selling the "Altair."  The Altair uses the same technology and is merely an improved version of the E.DOC.  Those improvements were developed by [Evans] while the Agreement was effective, did not involve "designing around the patent," and are owned by [IES].

Id. at ¶ 12.

The arbitrator found that Evans had breached the Agreement by

    a.  Failing to pay royalties to [IES].
    b.  Failing to cease production of the DNC technology,
    failing to cease use of the technical information, and
    failing to return the technical information.
    c.  Failing to assign to [IES] any patents and
    improvements to the DNC technology.

Id. at ¶ 13.

The arbitrator ordered that Evans "cease manufacture and sale of all Licensed Products, including the E.DOC and Altair, without paying royalties to [IES] as specified in the Agreement." Id.  The arbitrator concluded that the Agreement was "valid and enforceable."  Id.

In December 2004, the arbitrator issued his Final Award. The arbitrator awarded IES $127,823.30, which he calculated using the Agreement's royalty rate.  He also awarded IES interest, costs, and attorney's fees.

The arbitrator ordered that Evans return technical information to IES and stop manufacturing and selling the E.DOC and the Altair products.  The arbitrator stated that Evans could continue to manufacture and sell licensed products only "if the parties enter into a new license agreement."  Final Award at 2, ¶ 5.

In January 2005, the arbitrator's Final Award was entered as a stipulated judgment in state court.  Evans has since satisfied the judgment.

In March 2005, IES and Evans executed a licensing agreement

similar but not identical to the parties' previous agreement.

In October 2005, IES filed this action for patent infringement against Misonix and Evans.  IES claims that defendants infringed three of IES's patents on gas neutralization technology.  Shiban states that the March 2005 licensing agreement with Evans terminated at about the time IES brought this action.

## STANDARDS

The court must grant summary judgment if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  If the moving party shows that there are no genuine issues of material fact, the nonmoving party must go beyond the pleadings and designate facts showing an issue for trial.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

The substantive law governing a claim or defense determines whether a fact is material.  See T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).  The court should resolve reasonable doubts about the existence of an issue of material fact against the moving party. Id. at 631.  The court should view inferences drawn from the facts in the light most favorable to the nonmoving party.  Id. at 630-31.

## DISCUSSION

Defendants' motion for summary judgment relies on six affirmative defenses:  claim and issue preclusion, the Rooker-

<u>Feldman</u> doctrine[2], the alleged existence of an ongoing implied license, and, as to Misonix only, the patent law doctrines of "first sale" and "full compensation."  I conclude that defendants are entitled to summary judgment based on claim preclusion and the existence of an implied license until September 2004.

## I.  Claim Preclusion

Defendants contend that IES's failure to pursue its patent infringement claims in the arbitration proceeding bars IES from bringing those claims here.  IES responds that the Agreement did not require arbitration of the patent infringement claims.

### A.  Background

The Agreement has a provision governing choice of law and the arbitration of disputes:

> This Agreement is executed and delivered in the state of Oregon, USA, and it shall be construed in accordance with the law of the State of Oregon USA, except the conflict of laws rule.  <u>Any dispute relating the [sic] interpretation or performance of this Agreement shall be conducted in the county of Washington, Oregon, in accordance with the then existing rules of the American Arbitration Association.</u>  Judgment upon any award by the arbitrator(s) may be entered by the state or Federal Court having jurisdiction.  The prevailing party of such arbitration is entitled to arbitration fees and reasonable attorney fees as determined by the arbitrator(s).  <u>In the event that resolution is not reached through arbitration, any dispute relating to the interpretation or performance of this agreement shall be conducted in the county of Washington, Oregon, USA, and the applicable state or federal court.</u>  The

---

[2]  The <u>Rooker</u>-<u>Feldman</u> doctrine precludes lower federal courts from hearing claims that collaterally attack prior state court decisions.  <u>See</u> <u>Ignacio v. Judges of U.S. Court of Appeals for the Ninth Circuit</u>, 453 F.3d 1160, 1165 (9th Cir. 2006); <u>District of Columbia Court of Appeals v. Feldman</u>, 460 U.S. 462, 482 & n.16 (1983); <u>Rooker v. Fidelity Trust Co.</u>, 263 U.S. 413, 415-16 (1923).

        prevailing party shall be entitled to court fees and
        reasonable attorney fees as determined by the court.

Agreement, at 8, ¶ 29 (emphasis added).  The arbitration clause

contains a typographical error, omitting the word "to" in the

clause, "Any dispute <u>relating [to]</u> the interpretation or

performance of this Agreement."  There is no dispute that IES and

Evans intended to use the phrase "relating to."  <u>See</u> Pltf.'s Mem.

in Opp. at 19.

    **B.  Standards**

        **1.  Claim Preclusion**

    "The doctrine of claim preclusion, formerly known as <u>res</u>

<u>judicata</u>, generally prohibits a party from relitigating the same

claim or splitting a claim into multiple actions against the same

opponent."  <u>Bloomfield v. Weakland</u>, 339 Or. 504, 510, 123 P.3d

275, 279 (2005).  "[A] plaintiff who has prosecuted one action

against a defendant through to a final judgment binding on the

parties is barred on res judicata grounds from prosecuting

another action against the same defendant where the claim in the

second action is one which is based on the same factual

transaction that was at issue in the first, seeks a remedy

additional or alternative to the one sought earlier, and is of

such a nature as could have been joined in the first action."

<u>Rennie v. Freeway Transport</u>, 294 Or. 319, 323, 656 P.2d 919, 921

(1982) (citations omitted).  "Well-settled principles of claim

preclusion 'foreclose[ ] a party that has litigated a claim

against another from further litigation on that same claim on any

ground or theory of relief <u>that the party could have litigated</u> in

8  - OPINION AND ORDER

the first instance.'" <u>Lincoln Loan Co. v. City of Portland</u>, 340 Or. 613, 619-20, 136 P.3d 1, 4-5 (2006) (quoting <u>Bloomfield</u>, 339 Or. at 511, 123 P.3d at 279) (emphasis added by <u>Lincoln Loan</u> court).

### 2.  Arbitrability

Although the Agreement provides that state law governs its construction, federal law determines the scope of the Agreement's arbitration clause.  <u>See</u> <u>Tracer Research Corp. v. National Envt'l Servs. Co.</u>, 42 F.3d 1292, 1294 (9th Cir. 1994).  "'[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitrability.'"  <u>Simula, Inc. v. Autoliv, Inc.</u>, 175 F.3d 716, 720-21 (9th Cir. 1999) (quoting <u>Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.</u>, 460 U.S. 1, 24-25 (1983)).  "Parties may agree to arbitrate patent infringement and validity issues, and such agreements bind the parties."  <u>Deprenyl Animal Health, Inc. v. University of Toronto Innovations Foundation</u>, 297 F.3d 1343, 1357 (Fed. Cir. 2002) (citing 35 U.S.C. § 294 ("A contract involving a patent or any right under a patent may contain a provision requiring arbitration of any dispute relating to patent validity or infringement arising under the contract.  . . . Any such provision or agreement shall be valid, irrevocable, and enforceable, except for any grounds that exist at law or in equity for revocation of a contract.")).

### C.  Discussion

IES contends that claim preclusion does not apply because the arbitration clause is not broad enough to require that it

submit patent infringement claims to arbitration.  The
arbitration clause provides, "Any dispute relating [to] the
interpretation or performance of this Agreement shall be
conducted in the county of Washington, Oregon, in accordance with
the then existing rules of the American Arbitration Association."

In arguing that the arbitration clause is narrow, IES cites
Mediterranean Enterprises, Inc. v. Ssangyong Corp., 708 F.2d 1458
(9th Cir. 1983) (MEI).  In MEI, the arbitration clause required
arbitration of "[a]ny disputes arising hereunder."  The MEI court
concluded the phrase "arising hereunder" was "intended to cover .
. . only those [disputes] relating to the interpretation and
performance of the contract itself."  Id. at 1464.[3]

The MEI court distinguished arbitration clauses requiring
arbitration of disputes "arising out of or relating to" an
agreement.  Id. (emphasis added).  The court stated that by
omitting the phrase "relating to," the arbitration clause at
issue there was limited to disputes arising out of the agreement
itself.  Accordingly, in a subsequent decision interpreting an
arbitration clause requiring arbitration of any dispute "arising
out of or relating to" the parties' agreement, the Ninth Circuit

---

[3] The Ninth Circuit's approach has been criticized as
inconsistent with federal policy favoring arbitration.  See
Battaglia v. McKendry, 233 F.3d 720, 727 (3d Cir. 2000)
(rejecting MEI's reasoning and stating that the phrases "arising
under" and "arising out of" "are normally given broad
construction"); H.S. Gregory v. Electro-Mechanical Corp., 83 F.3d
382, 385 (11th Cir. 1996) (accord); Long v. Silver, 248 F.3d 309,
317 (4th Cir. 2001) (accord).

10 - OPINION AND ORDER

concluded that the arbitration clause was "broad and far
reaching." Chiron Corp. v. Ortho Diagnostic Sys., Inc., 207 F.3d
1126, 1131 (9th Cir. 2000).  Similarly, the Ninth Circuit held
that an agreement requiring arbitration of all disputes "arising
in connection with this Agreement" covered "every dispute between
the parties having a significant relationship to the contract and
all disputes having their origin or genesis in the contract."
Simula, Inc. v. Autoliv, Inc., 175 F.3d 716, 721 (9th Cir. 1999).
See also Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S.
395, 406 (1967) (clause requiring arbitration of "[a]ny
controversy or claim arising out of or relating to" the agreement
"easily broad enough to encompass Prima Paint's claim that both
execution and acceleration of the consulting agreement itself
were procured by fraud"); Drews Distrib., Inc. v. Silicon Gaming,
Inc., 245 F.3d 347, 350 (4th Cir. 2001) ("the arbitration clause
in the Distributor Agreement is a 'broad' one, covering as it
does 'any controversy or claim arising out of or related to' that
agreement"; "the reach of an arbitration clause is not restricted
to those causes of action brought under the contract containing
the clause, unless the parties draft a clause so restricted in
scope"); Acevedo Maldonado v. PPG Industries, Inc., 514 F.2d 614,
616 (1st Cir. 1975) (arbitration clause requiring arbitration of
"any controversy or claim arising out of or relating to this
Agreement or the breach thereof" broad enough to cover
"contract-generated or contract-related disputes between the
parties however labeled: it is immaterial whether claims are in

11 - OPINION AND ORDER

contract or in tort, or are couched in terms of the contribution owed by one tortfeasor to another"); CD Partners, LLC v. Grizzle, 424 F.3d 795, 800 (8th Cir. 2005) (arbitration clause requiring arbitration of "any claim, controversy or dispute arising out of or relating to Franchisee's operation of the Franchised business under the Agreement" was "broadly worded" and has been "generally construed to cover tort suits arising from the same set of operative facts covered by a contract between the parties to the agreement"); P & P Industries v. Sutter Corp., 179 F.3d 861, 871 (10th Cir. 1999) (arbitration clause requiring arbitration of "[a]ny controversy, claim, or breach arising out of or relating to this Agreement" broad enough to include tort claims when the alleged improper conduct concerned a party's decision to terminate the agreement).

Here, the arbitration clause is broad and IES's patent infringement claims are "related to" the "interpretation or performance" of the Agreement. IES argues, however, that the Agreement allowed it to choose whether to resolve the patent infringement claims in the arbitration proceedings or in this court. IES relies on a clause in the arbitration provision which provides that "any dispute relating to the interpretation or performance of this agreement shall be conducted in the county of Washington, Oregon, USA, and the applicable state or federal court." However, as defendants point out, that clause must be read with the clause immediately preceding it, which states, "In the event that resolution is not reached through arbitration . .

12 - OPINION AND ORDER

. ."  The Agreement therefore allows a party to bring a dispute to court only if the dispute was not resolved in arbitration.  It is true that IES's patent infringement claims were not resolved in arbitration, but that is only because IES chose to withdraw those claims.  Under IES's construction of the Agreement, the arbitration clause would be optional rather than mandatory, allowing a party at its whim to withdraw a claim from arbitration and take it to court.  For example, here IES states that it withdrew the patent infringement claims because they were too complex for arbitration.  However, if IES considered patent infringement claims too complex for arbitration, it should have insisted on a patent infringement exception to the Agreement's arbitration clause.

The arbitration clause here is broad and mandatory, requiring arbitration of IES's patent infringement claims.  All the requirements for claim preclusion are present: a final judgment binding on the parties; claims based on the same facts as the claims in the previous proceeding; and a party seeking "a remedy additional or alternative to the one sought earlier, and . . . of such a nature as could have been joined in the first action." Rennie, 294 Or. at 323, 656 P.2d at 921.  Given the presumption in favor of arbitration, I conclude that IES is barred from bringing patent infringement claims based on defendants' allegedly infringing conduct occurring while the implied license agreement was in effect.

///

13 - OPINION AND ORDER

**II.  The Duration of the Implied License Agreement**

The parties agree that the arbitrator's findings are binding
here.  The parties further agree that defendants' sales of the
E.DOC or Altair products under license cannot infringe IES's
patents.  The parties also agree that there was an implied
license agreement between IES and Evans in effect from March 2000
until April 2002.  The parties disagree, however, on whether the
implied agreement remained in effect after April 2002, when Evans
began selling the Altair and stopped paying royalties to IES.
The parties disagree on what the arbitrator found regarding the
duration of the implied license agreement.  IES contends that the
arbitrator found that the Agreement terminated in April 2002.
IES argues that the arbitrator's award of damages to IES was
based on the Agreement's post-termination remedies, and that the
arbitrator's use of the word "royalties" in describing the
damages did not indicate that he was awarding damages based on an
implied agreement.  Instead, IES argues, the arbitrator used the
royalty rate as a convenient measure of post-termination damages.

Defendants contend that the arbitrator found an implied
agreement that was in effect until September 30, 2004, the last
day for which the arbitrator awarded damages.[4]

---

[4]  Defendants rely in part on a declaration submitted by the
arbitrator, which is the subject of IES's motion to strike.  I
conclude that I need not consider the arbitrator's declaration in
resolving this issue, and therefore deny the motion to strike as
moot.  I note, however, that the claim preclusion effect of an
arbitration ruling may, itself, be referred to the arbitrator,
see Chiron, 207 F.3d at 1132.  Neither party here sought

14 - OPINION AND ORDER

The arbitrator's Interim Award is ambiguous on the duration of the implied license.  The arbitrator almost certainly did not focus on this issue.  Instead, the arbitrator logically made only those findings necessary to resolve the claims before him, which did not require an express finding on the duration of the implied agreement.  Now, however, to resolve the pending cross motions for summary judgment, this court must determine the duration of the parties' implied agreement, based on the undisputed facts in the record and applicable law.

"An implied license may arise by equitable estoppel, acquiescence, conduct, or legal estoppel."  Winbond Elec. Corp. v. International Trade Comm'n, 262 F.3d 1363, 1374 (Fed. Cir. 2001), corrected on other grounds, 275 F.3d 1344 (Fed. Cir. 2001).  An implied license, like an express license, is a complete defense to an action for infringement.  See Glass Equip. Dev., Inc. v. Besten, Inc., 174 F.3d 1337, 1341-42 (Fed. Cir. 1999).  The existence of an implied license is a question of law. See Met-Coil Sys. Corp. v. Korners Unlimited, 803 F.2d 684, 687 (Fed. Cir. 1986).  The parties agree that in determining whether the implied license remained in effect after April 2002, this court is bound by the arbitrator's findings.

To support its contention that the implied license terminated in April 2002, IES relies on the arbitrator's finding

---

arbitration of this dispute, so this court need not remand to the arbitrator.  See United Computer Sys., Inc. v. AT&T Corp., 298 F.3d 756, 765 (9th Cir. 2002).

that "Claimant [IES] and Respondent [Evans] continued to perform as if an agreement existed until April 2002, and, therefore, had an implied agreement." IES argues that this finding shows that the arbitrator found that the implied license ended in April 2002. However, I read the finding as a determination by the arbitrator that until April 2002, Evans complied with the implied license, and that after April 2002, Evans did not comply with the implied license. As I interpret the Interim Award, the arbitrator ruled that Evans's failure to pay royalties on sales of the Altair breached the implied license but did not terminate Evans's obligations under the implied license. This interpretation is consistent with the arbitrator's use of the Agreement's royalty rate as the measure of IES's damages.

IES argues that the arbitrator's award of damages tracks the Agreement's post-termination remedies, showing that the arbitrator considered the Agreement to be terminated. Assuming that the arbitrator used the Agreement's post-termination remedies to calculate IES's damages, that does not show that the implied license terminated in April 2002 or that the arbitrator considered it terminated.

I conclude that the arbitrator awarded damages under the implied license, as he construed it, guided by the provisions of the expired Agreement. I also conclude that the implied license was in effect until September 30, 2004, the end date for the arbitrator's award of damages. By ordering that Evans return trade secret information to IES in the Interim Award, the

16 - OPINION AND ORDER

arbitrator signaled his conclusion that September 30, 2004 was the last day of the implied license. The Final Award states that Evans could continue to manufacture and sell licensed products only "if the parties enter into a new license agreement." Final Award at 2, ¶ 5. Because the arbitrator's findings are binding here, I conclude that this court should accept September 30, 2004, as the end date of the implied license.

IES notes that both parties argued during the arbitration proceedings that any implied license agreement had terminated "long before" the arbitration. However, this court is bound not by the parties' arguments but by the arbitrator's rulings. Evans is not required to adhere to its former positions, which were soundly and conclusively rejected by the arbitrator.

Because of my conclusion that the implied license agreement lasted until September 30, 2004, Misonix cannot be liable for its transactions with Evans up to that date. See Met-Coil, 803 F.2d at 687.

Because of my rulings on claim preclusion and the duration of the implied license, I need not address the other affirmative defenses raised by defendants. Defendants' motion for summary judgment is therefore denied as moot as to the other affirmative defenses. IES's motion for summary judgment is denied.

///

///

///

///

17 - OPINION AND ORDER

**CONCLUSION**

Defendants' motion for summary judgment (#41) is granted in part. Plaintiff's motion for summary judgment (#51) is denied. Plaintiff's motion to strike (#64) is denied as moot.


DATED this 17th day of October, 2006.


_____/s/ Paul Papak_____
Honorable Paul Papak
United States Magistrate Judge

18 - OPINION AND ORDER